CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED
2016 JUN 22 PM 1:39
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| WENDY ANN LEAKE, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | No. 4:15-CV-0475-BL |
| § | |
| CAROLYN W. COLVIN, § | |
| Acting Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U. S. C. § 405 (g), Plaintiff seeks judicial review of a decision of the Commissioner for Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.[1] *See* Compl. (doc. 1). The Commissioner has filed an answer, *see* Def.'s Answer (doc. 10), and a certified copy of the transcript of the administrative proceedings, *see* SSA Admin. R. [hereinafter "Tr."] (doc. 12), including the hearing before the Administrative Law Judge ("ALJ"). The parties have briefed the issues. *See* Pl.'s Br. (doc. 14); Def.'s Resp. Br. (doc. 15). The United States District Judge referred the case to the undersigned pursuant to 28 U.S.C. § 636 and the parties have not consented to proceed before a United States Magistrate Judge. After considering the pleadings, briefs, and administrative record, the undersigned recommends that the decision of the Commissioner be affirmed.

## I. BACKGROUND

Plaintiff claims that she is disabled due to a heart condition, arthritis, gout, bronchitis, and

---

[1] Final determinations under Title XVI are subject to the same judicial review as provided in § 405(g). *See* 42 U.S.C. § 1383(c)(3).

depression. Tr. 161. She filed applications for DIB and SSI on June 27, 2012,[2] alleging disability beginning September 11, 2008. Tr. 123, 127. She later amended the alleged onset date to September 30, 2011, Tr. 232, the date she was last insured, *see* Tr. 149. Therefore, the relevant time period for these applications and the Court's review commenced September 30, 2011. *See* Tr. 27. The Commissioner denied both applications initially on September 12, 2012, Tr. 62-63, and on reconsideration in January 2013, Tr. 64-65. At Plaintiff's request, *see* Tr. 88, she received a hearing before ALJ Christopher Van Dyck on September 18, 2013, *see* Tr. 33-60. On November 22, 2013, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled and was capable of performing work that existed in significant numbers in the national economy. Tr. 27.

Applying the five-step analysis set out in 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the date of alleged onset of disability. Tr. 15. The ALJ next determined that Plaintiff suffered from the following severe impairments: degenerative joint disease in her knees, hips, and back; complex regional pain syndrome ("CRPS") involving her left hand; obesity; hypertension; depression with psychotic features; and post-traumatic stress disorder ("PTSD"). Tr. 15-16. Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[3] Tr. 17-19. The ALJ then determined that Plaintiff retained the residual

---

[2] A disability report, Tr. 149, and the ALJ's decision, Tr.13, state that Plaintiff filed her SSI application on June 7, 2012. The ALJ later states that Plaintiff filed both applications on June 7, 2012. Tr. 27. The Court uses the dates from the applications themselves. In any event, the filing date makes no difference to the Court's determination.

[3] The relevant regulations explain the purpose and use of the listings of impairments. *See* 20 C.F.R. §§ 404.1525, 416.925.

2

functional capacity ("RFC")[4] to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b)[5] with the following modifications: (1) frequently balance; (2) occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; (3) never climb ladders, ropes, or scaffolds; (4) handle and finger with he left upper extremity no more than frequently; (5) avoid exposure to vibration; (6) mentally able to understand, remember, and carry out simple instructions and tasks; (7) occasional contact with public, co-workers, and supervisors; and (8) able to adapt to occasional workplaces changes that are gradually introduced. Tr. 19. The ALJ found that Plaintiff had no past relevant work. Tr. 25. And based upon the RFC determination and testimony from a vocational expert, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy. Tr. 26-27. At Step 5 of the evaluative sequence, the ALJ found Plaintiff not disabled within the meaning of the Social Security Act at any point between September 30, 2011, and the date of his decision. Tr. 27.

The Appeals Council received and considered additional evidence – a three-page brief (Ex. 22E) and eighty-seven pages of medical records (Exs. 21F (dated September 27, 2012) and 22F

---

[4]A claimant's RFC "is the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. *Id.* §§ 404.1546(c), 416.946(c). But that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

[5]The regulations address physical exertion requirements and explain:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(a), 416.967(a).

(dated December 26, 2012, through December 19, 2013))– when it denied review on May 1, 2015.[6] Tr. 1-5. The ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on June 30, 2015. *See* Compl. She presents the following issues for review: whether substantial evidence supports the mental and physical RFC findings of the ALJ, and if not, whether remand is required. *See* Pl.'s Br. at 1.

## II. LEGAL STANDARD

In general,[7] a person is disabled within the meaning of the Social Security Act, when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). "'Substantial gainful activity' is work activity involving significant physical or mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th

---

[6]Notably, Exhibit 21F (Tr. 824-30) contains three copies of the same medical record and duplicates medical records that were before the ALJ. *See* Tr. 407-08. Exhibit 22F likewise contains duplicate copies of the same medical records. *Compare, e.g.*, Tr. 856-59, 898-99 *with* Tr. 862-65, 900-01. As noted later in this recommendation, the record contains other instances of duplicate records. Duplication of medical records hinders judicial review in that it requires the Court to ascertain whether each record is evidence of itself or whether it merely duplicates an already considered record. The Social Security Administration should take steps to omit unnecessarily duplicative medical records. Claimants and their attorneys, on the other hand, should take care not to submit records to the Commissioner that are mere copies of records already in the administrative file. Furthermore, when the administrative record contains duplicate copies, parties should not cite to multiple copies in an apparent effort to bolster their position. The better practice would be to point out the duplication or, at the very least, just cite to one copy. Duplicate copies add no value to either party's positions.

[7]The Act provides an alternate definition of disability for individuals under the age of eighteen, *see* 42 U.S.C. § 1382c(a)(3)(C), and blind individuals who are fifty-five years of age or older, *see* 42 U.S.C. § 423(d)(1)(B). These provisions are inapplicable on the current facts.

Cir. 2002) (citing 20 C.F.R. § 404.1572(a)-(b)); *accord* 20 C.F.R. § 416.972(a)-(b). To evaluate a disability claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the Commissioner determines that the claimant is or is "not disabled, the inquiry is terminated." *Id.* at 448. The Commissioner must assess the claimant's RFC before proceeding to Steps 4 and 5. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). For Steps 1 through 4, the claimant has to burden to show disability, but the Commissioner has the burden at Step 5 to "show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. If the Commissioner carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or she can perform other work that is available in the national economy. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a preponderance' of evidence." *Hardman v. Colvin*, No. 15-30449, 2016 WL 1551685, at *3 (5th Cir. Apr. 11, 2016) (quoting *Newton*, 209 F.3d at 452).

"In applying the substantial evidence standard, the court scrutinizes the record to determine

5

whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461; *accord Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Whitehead v. Colvin*, No. 15-30893, 2016 WL 1719932, at *5 (5th Cir. Apr. 28, 2016) (per curiam). The courts neither "try the questions *de novo*" nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The courts, however, do not mechanically accept findings and determinations of the Commissioner or find isolated facts to label as substantial. Evidence is not substantial when "the overwhelming majority of the evidence" supports a contrary conclusion. *Moore v. Colvin*, No. 5:12-CV-120-C, 2013 WL 3156505, at *4 (N.D. Tex. June 21, 2013) (adopting recommendation of Mag. J.). Furthermore, the Commissioner and not the court resolves conflicts of evidence. *Sun*, 793 F.3d at 508.

### III. ANALYSIS

In this appeal, Plaintiff seeks judicial review as to whether substantial evidence supports the mental and physical RFC findings of the ALJ, and if not, whether remand is required. *See* Pl.'s Br. at 1. The Court separately consider the mental and physical RFC issues.

### A. Mental RFC

Plaintiff quarrels with the ALJ's mental RFC determination that she could understand, remember, and carry out simple instructions and tasks, but was limited to occasional contact with others and must be introduced to workplace changes gradually. *See* Pl.'s Br. at 6. She argues that the ALJ mischaracterized her psychiatric treatment records as mostly normal and that the ALJ's rejection of opinions regarding her mental RFC makes his findings unsupported and subject to reversal and remand. *Id.* at 7.

6

Records of Plaintiff's primary care physician, Jaya Krishnamoorthy, M.D.,[8] indeed indicate that Plaintiff has reported auditory hallucinations, flashbacks, sleep disturbance, anxiety, stress, and night terrors. See Tr. 401 (insomnia); 403 (auditory hallucinations and sleep disturbance); 407 (auditory hallucinations and flashbacks); 414-15 (stress and anxiety); 434 (hallucinations); 453-54 (night terrors, nightmares, sleep disturbance, auditory hallucinations); 500 (stress, anxiety, and sleep disturbance); 638 (sleep disturbance, hallucinations, anxiety, insomnia), 640 (hallucinations and sleep disturbance). That lengthy list, however, reveals only part of her psychiatric history. A chronological summary of her psychiatric record reveals a more complete picture. As recited below, the record contains substantial evidence to support the ALJ's mental RFC determination.

On June 7, 2012, Dr. Krishnamoorthy noted that Plaintiff denied suicidal or homicidal thoughts and depression, but cried during the interview. Tr. 414. In the doctor's summary of subjective notes, she recorded: "Positive for dysphoric mood. Negative for suicidal ideas, hallucinations, confusion, sleep disturbance, self-injury and decreased concentration. The patient is nervous/anxious. The patient is not hyperactive." Id. In bold, she noted that Plaintiff was stressed and anxious. Id. In the doctor's objective portion of her notes, she reiterated that Plaintiff was stressed, but she was also alert; oriented to person, place, and time; and had normal thought content and judgment. Tr. 415. Dr. Krishnamoorthy found Plaintiff's psychiatric behavior "normal" and prescribed medication for her stress. Id.

Despite three visits to Dr. Krishnamoorthy in July 2012, the medical record reveals no indication of psychiatric problems that month. See Tr. 409, 411, 412. Near the end of the month, Dr. Krishnamoorthy noted: "[Patient] has a normal mood and affect." Tr. 409.

---

[8] Dr. Krishnamoorthy provided services through John Peter Smith ("JPS") Hospital or a related physician group.

On August 21, 2012, Ed G. Bleker, Ph.D., conducted a consultative mental status examination of Plaintiff for Disability Determination Services. *See* Tr. 333. He found Plaintiff oriented, alert, cooperative, and attentive to instructions. Tr. 335. Plaintiff could spell "world" backwards, do serial 7's for six iterations before he stopped her, and remember five numbers forward and three backward. *Id.* She had a logical and goal-directed thought process "with no loosening of associations." Tr. 336. She admitted to no delusions or auditory or visual hallucinations. *Id.* Dr. Bleker found her to be average to slightly above average in cognitive/intellectual status. *Id.* Plaintiff had good insight into her illness and need for treatment. *Id.* She reported that "she has no difficulty with interpersonal relationships other than the abusive relationship she was involved in for six years." Tr. 337. Dr. Bleker noted: "She appears to get along with others easily and is quite relational during her interview with this examiner." *Id.* He diagnosed a major depressive disorder ("MDD") without psychotic features, chronic PTSD, and an avoidant personality trait. *Id.* He formulated a guarded prognosis and noted:

> Much will depend on the progress or lack thereof of her degenerative joint disease in hips, knees and lower back. Additionally, the internalization of significant PTSD anxiety and its likely relation to two mild heart attacks is an even longer term issue, as participation in a structured program of psychosocial counseling/therapy will likely be required. At this point, however, her participation in any consistent and reliable manner in mainstream competitive activity at a gainfully employable level is quite doubtful.

Tr. 338. Despite that prognosis, he found Plaintiff "able to understand the reasons and implications for her [disability] application, and she would be able to handle the benefits in her own behalf." *Id.*

Janice Ritch, Ph.D. completed a Psychiatric Review Technique form for Plaintiff on September 25, 2012. Tr. 376-89. Dr. Ritch noted non-severe affective and anxiety-related disorders. Tr. 376. The doctor recognized a medically determinable impairment – MDD – that did not satisfy

diagnostic criteria for affective disorders. Tr. 379. She also recognized that Plaintiff suffered from anxiety as evidenced by "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." Tr. 381. Nevertheless, she found mild limitations in activities of daily living ("ADLs") and social functioning and moderate limitations in maintaining concentration, persistence, or pace ("CPP"). Tr. 386. She noted no history "of inpatient psychiatric treatment." Tr. 388. She further noted the consultative examination of Dr. Bleker and concluded that Plaintiff's report of limitations "indicates that issues are related to physical conditions." *Id.* She found Plaintiff mentally capable of ADLs, Plaintiff had intact social functioning, and Plaintiff appeared "capable of CPP appropriate for vocational activities." *Id.*

On September 27, 2012, Plaintiff reported auditory hallucinations and increased flashbacks, but was not suicidal or homicidal. Tr. 407. Subjectively, Dr. Krishnamoorthy noted Plaintiff was "[n]egative for behavioral problems and confusion." *Id.* Objectively, she stated: "[Patient's] behavior is normal. Judgment and thought content normal." *Id.* She found Plaintiff suffering from PTSD and depression. Tr. 408. The next month, Dr. Krishnamoorthy again noted that Plaintiff was "[n]egative for behavioral problems and confusion." Tr. 405. At that time, Plaintiff reported that her stress medication was "not helping." *Id.* The doctor made no objective medical statement regarding Plaintiff's psychiatric condition, but did prescribe medication for depression. *See* Tr. 405-06.

On November 19, 2012, Joseph Dominick Pallone, M.D., of JPS examined Plaintiff following complaints of hot flashes and night sweats. Tr. 427. Plaintiff also reported mood swings. *Id.* Subjectively, his review of Plaintiff's psychiatric and behavioral systems were negative. *Id.* Objectively, he noted: "[P]atient has a normal mood and affect. Her behavior is normal. Judgment and thought content normal." *Id.* A JPS record dated November 27, 2012, likewise notes normal

behavior and judgment, although it further notes that "patient is nervous/anxious" and "[p]ositive for hallucinations and sleep disturbance." Tr. 640. Another medical record of the same date by Dr. Krishnamoorthy notes several diagnoses, including sleep disturbance, hallucinations, unspecified anxiety and insomnia, and depressive disorder. Tr. 638.

According to records of Dr. Krishnamoorthy dated November 29, 2012, Plaintiff reported "some improvement in her depression" with medication "but was not completely normal" and she continued to report auditory hallucinations and "recurrent memories of traumatic past events." Tr. 403. Dr. Krishnamoorthy noted in the subjective section of her notes: "Positive for hallucinations and sleep disturbance. Negative for suicidal ideas, behavioral problems and confusion. The patient is nervous/anxious." *Id.* On December 16, 2012, the doctor added a positive result for agitation, but otherwise reiterated the November subjective findings. Tr. 401. The doctor also assessed "Insomnia/PTSD/Depression" that she planned to treat with continued medication and a new prescription. *Id.* She advised Plaintiff to see a psychiatrist. Tr. 402.

On January 17, 2013, Don Marler, Ph.D., affirmed the findings of Dr. Ritch as written while also noting that Plaintiff received psychological medication through her primary care physician and reported auditory hallucinations and anxiety, but there was no indication of psychotic process. *See* Tr. 424.

Dr. Pallone saw Plaintiff again on January 21, 2013. *See* Tr. 426. Her hot flashes and night sweats were "markedly improved" with the treatment started in November 2012. *Id.* The doctor's psychiatric notes were unchanged from the November examination. *Compare* Tr. 426 *with* Tr. 427. The next day, Plaintiff reported stress to Dr. Krishnamoorthy. Tr. 500. Subjectively, Plaintiff was nervous, anxious, and positive for sleep disturbance. *Id.* She was negative for behavioral problems,

10

suicidal ideas, confusion, and dysphoric mood. *Id.* Objectively, Dr. Krishnamoorthy noted normal behavior, judgment, and thought content. *Id.*

Dr. Krishnamoorthy treated Plaintiff's physical impairments on February 24, 2013. Tr. 492-93. With respective to psychiatric system review, she merely reiterated that Plaintiff was "[n]egative for behavioral problems and confusion." Tr. 492. On referral from Dr. Krishnamoorthy, Plaintiff visited Charli Ellis, DO the next day. Tr. 453. Plaintiff reported night terrors and depression. *Id.* She also stated that she had "never seen a psychiatrist." *Id.* Plaintiff was alert; cooperative; oriented as to person, place, and time; exhibited no suicidal or aggression risk, and reported no hallucinations. *Id.* Dr. Ellis noted that Plaintiff exhibited a depressed mood; anxiousness; sleep disturbance, including nightmares and trouble falling asleep; decreased energy; increased appetite; guilt as reflected by her concern that she is always doing something wrong; poor concentration; distractible and non-command type auditory hallucinations, i.e., hearing derogatory comments about herself; and no suicidal ideation, elated mood, or decreased interest. Tr. 454. Dr. Ellis further noted: "I don't think she's actually having [auditory hallucinations]." *Id.* According to Dr. Ellis, Plaintiff's mental state had isolated her and interfered with relationships and social roles. *Id.* Dr. Ellis also recorded that Plaintiff had "no problems" in mathematics and reading. Tr. 457. A mental status examination revealed good eye contact, concentration, and articulation; normal intellectual faculties; agitation; moderately severe depressed mood, nervousness, and anxiety; goal-directed and logical thought processes; good insight and judgment; and no delusions or hallucinations.[9] Tr. 457-58. Dr. Ellis

---

[9] Dr. Ellis does not explain the notation regarding no hallucinations. Given the prior note in the record of auditory hallucinations that the doctor did not believe, the notation of no hallucinations could indicate no believable hallucinations or perhaps no visual hallucinations. The ultimate meaning of the notation has no impact on the findings, conclusions, or recommendation of the undersigned.

noted a fair prognosis and diagnosed PTSD and MDD (moderate and recurring). Tr. 460. She developed a medication plan and recommended that Plaintiff attend outpatient counseling. Tr. 461.

On June 30, 2013, Plaintiff visited Dr. Krishnamoorthy for medication refills. Tr. 487. Subjectively, she was still "[n]egative for behavioral problems and confusion." *Id.* Objectively, Dr. Krishnamoorthy noted that Plaintiff had normal mood, affect, and behavior. Tr. 488.

Plaintiff returned to Dr. Ellis on July 23, 2013. Tr. 433. Her condition had "partially improved." *Id.* The mental status examination remained materially the same, except that Plaintiff was no longer agitated and had minimal depression and no indication of nervousness or anxiety. *Compare* Tr. 434 *with* Tr. 457-58. With respect to hallucinations, Dr. Ellis noted: "auditory hallucinations (voices making derogatory comments - AH vs internal thoughts?) and visual hallucinations (deceased relatives or 'angels')." Tr. 434. Plaintiff discussed her hallucinations "at length" and stated that she was "certain they are actual hallucinations and not just her own internal dialogue" and further stated that the auditory hallucinations occur both "during the day and night but are more distressing in the evening." Tr. 437. Dr. Ellis diagnosed PTSD and severe MDD with psychotic component. *Id.* She altered the medication plan. Tr. 438.

Plaintiff sought treatment for physical impairments from John B. Locke, D.O., on September 16, 2013. *See* Tr. 481-82, 898-99.[10] Dr. Locke noted that she was "[n]egative for behavioral problems and agitation" and stated that she had normal mood, affect, and behavior. *Id.* The next month, Dr. Locke noted a normal mood and affect, Tr. 904, and Dr. Krishnamoorthy noted that Plaintiff was "[n]egative for behavioral problems and confusion," Tr. 405.

---

[10]These records are essentially the same, but not identical – unlike duplicate records mentioned in an earlier footnote.

Plaintiff points to portions of the record to show that her psychiatric treatment records were not mostly normal as summarized by the ALJ. *See* Pl.'s Br. at 7. Discounting the fact that several of the cited records are merely duplicate entries, *compare* Tr. 401, 403, 433-34, 444, 454 *with* Tr. 439-40, 450, 463, 508, 513, 641,[11] a review of the medical record as a whole, including those cited by Plaintiff, supports finding that substantial evidence supports the mental RFC of the ALJ. While the medical record has entries recognizing various psychiatric complaints or symptoms such as hallucinations; flashbacks; sleep disturbance, including night terrors and nightmares; anxiety; and stress, the medical record as a whole provides ample support for finding substantial evidence to support that RFC determination. The record overwhelmingly supports the determination that Plaintiff can understand, remember, and carry out simple instructions and tasks. The record also supports limiting Plaintiff to occasional contact with others and introducing workplace changes to her gradually. If anything, the ALJ generously imposed these limitations based on sparse indications from the medical record. The Court should find no error with the ALJ's mental RFC determination.

That the ALJ gave little weight to the opinions of the consultative examiner (Dr. Bleker) and the state agency reviewers (Drs. Ritch and Marler) for a variety of reasons, *see* Tr. 24, provides no basis to find a lack of substantial evidence to support the mental RFC determination. This is not a case where the ALJ relied on his own medical opinions. The record clearly reflects that the ALJ relied on medical records of Dr. Bleker at Step 3 of the evaluative sequence to find that Plaintiff "experiences no more than moderate difficulties in social functioning" and "with regard to concentration, persistence, or pace." Tr. 18. In assessing Plaintiff's RFC, the ALJ also relied on the psych-

---

[11]Plaintiff cites pages 444 and 450 of the record, which duplicate page 437 that Plaintiff does not cite. The Court cites to page 437 when necessary simply because it comes earlier in the administrative record.

ological evaluation by Dr. Bleker, *see* Tr. 23-24, even though the ALJ specifically rejected the non-medical opinion that Plaintiff's ability to participate in competitive employment was "quite doubtful," Tr. 24. Moreover, the ALJ relied on the psychiatric opinions of Dr. Ellis in formulating his mental RFC assessment. *Id.* The Court should find that the medical record provides substantial evidence to support the ALJ's mental RFC determination.

## B. Physical RFC

Plaintiff likewise argues that the ALJ's physical RFC findings are not supported by substantial evidence because the ALJ rejected all opinions regarding her RFC. Pl.'s Br. at 10-11. She specifically takes issue with the ALJ rejecting the opinion of a non-examining state agency consultant Lee Etier, III, M.D. *Id.* at 10 (quoting Tr. 374). She contends that without the rejected medical opinions the record contains no evidence as to how her physical impairments affect her ability to work. *Id.* at 11.

In August 2012, Dr. Etier conducted a consultative examination of Plaintiff on behalf of Disability Determination Services. Tr. 372-74. He assessed her physical condition as follows: "The patient's ability to do any type of physical labor would be negligible due to her complaint of severe pain." Tr. 374. The ALJ gave this opinion little weight because he found it "somewhat vague" in that it could refer only "to work that is performed at a medium or higher exertional level." Tr. 25. Interpreting it as precluding all work, the ALJ further found the opinion inconsistent with other medical evidence and not supported by the findings of the consultative examination. *Id.* The ALJ also discounted the opinion on grounds that Dr. Etier did not provide a "function by function analysis" and primarily based the opinion on the claimant's subjective allegations of pain, which the ALJ found "less than credible." *Id.*

The next month, Leigh McCrary, M.D., completed a Physical RFC Assessment for Plaintiff after reviewing the medical record. Tr. 390-97. She found Plaintiff limited to lifting or carrying fifty pounds occasionally and ten pounds frequently. Tr. 391. According to Dr. McCrary, Plaintiff could stand/walk or sit for about six hours in an eight-hour day and had no limitations regarding pushing or pulling. *Id.* Although the form provides space to explain how or why the evidence supports her conclusions as to Plaintiff's exertional limitations, Dr. McCrary left that space blank. *See id.* Dr. McCrary also found that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. Tr. 392-94. She recognized that there were no "medical source statement(s) regarding the claimant's physical capacities in [the] file."[12] Tr. 396. In her additional comments, furthermore, she noted that "Alleged limitations are currently supported, but not expected to last 12 months" and that the record contained insufficient evidence prior to date last insured, September 30, 2011. Tr. 397.

The ALJ discounted Dr. McCrary's lifting restriction (fifty pounds occasionally) and her lack of environmental and postural restrictions. Tr. 25. The ALJ primarily accorded such opinions little weight because subsequent evidence developed in the case supports a "more restrictive RFC . . . i.e., a light RFC with additional postural and environmental (no vibration) limitations." *Id.* However, the ALJ's RFC assessment is entirely consistent with other opinions of Dr. McCrary, i.e., lifting no more than ten pounds frequently, standing/walking and sitting for six out of eight hours, and no

---

[12]The regulations address the need for medical reports, including a medical source statement. *See* 20 C.F.R. §§ 404.1513(b), 416.913(b). As explained to social security claimants, a medical report should include
> A statement about what you can still do despite your impairment(s) based on the acceptable medical source's findings on the factors under paragraphs (b)(1) through (b)(5) of this section (except in statutory blindness claims). Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete.

*See* 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6).

visual or communicative limitations.

The ALJ, furthermore, explained that, "although the claimant's left thumb is not as disabling as alleged by the claimant, the medical evidence is sufficient to warrant a manipulative limitation in the RFC to include not more than frequent handling/fingering in the left upper extremity." Tr. 21. When discussing Plaintiff's CRPS, the ALJ again noted that limitation and found that the "evidence simply does not support further limitation." Tr. 22. In addition, the ALJ considered Plaintiff's obesity "in developing a pretty restrictive RFC to include light level exertion with additional postural . . . manipulative and environmental limitations." Tr. 23.

As recognized by the ALJ, a claimant's obesity requires consideration of Social Security Ruling 02-1p. Tr. 23. ALJs should assess "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, SSR 02-1p, 2002 WL 34686281, at *6 (S.S.A. Sept. 12, 2002). Like "any other impairment," ALJs will explain how they reached their "conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7. Obesity can limit a person's functioning but the specific functions "likely to be limited depend on many factors." *Id.* at *6. Depending on the circumstances, an obese claimant may have (1) exertional limitations in sitting, standing, walking, lifting, carrying, pushing, and pulling; (2) postural limitations in climbing, balance, stooping, and crouching; (3) manipulative limitations due to fatty tissue in hands and fingers; or (4) environmental limitations due to extreme heat, humidity, or other hazards. *Id.*

The ALJ in this case considered the ramifications of Plaintiff's obesity and SSR 02-1p when assessing Plaintiff's physical RFC. Tr. 23. Given the medical record, other administrative evidence, and the claimant's obesity and other impairments, the ALJ concluded that Plaintiff could not perform

16

the full range of light work. *See* Tr. 19-25. The ALJ thus found Plaintiff limited in varying degrees as to balancing; stooping; kneeling; crouching; crawling; and climbing ramps, stairs, ladders, ropes and scaffolds. Tr. 19. As recognized by SSR 02-1p, limitations in these areas can be attributed to an individual's obesity. Furthermore, an ALJ may consider the effects of obesity as part of his function-by-function RFC analysis. *Beck v. Barnhart*, 205 F. App'x 207, 211 (5th Cir. 2006) (relying on SSR 96-8p). A claimant's obesity, moreover, may provide substantial evidence for an ALJ to recognize exertional and postural limitations on a given claimant's capacity to perform sustained work-related activities. *Id.* at 211, 213. The Court should find that substantial evidence supports the assessed RFC limitations resulting from the ALJ's consideration of Plaintiff's obesity.

Based on his review of the medical and administrative record, the ALJ concluded that the evidence warranted limitations on Plaintiff's functioning greater than those noted by medical consults. Despite the ALJ's rejection of Dr. Etier's opinion regarding Plaintiff's ability to do physical labor and rejection of Dr. McCrary's opinions regarding Plaintiff's ability to lift weight occasionally and whether she suffers from any environmental or postural restrictions, the record contains substantial evidence to support the physical RFC assessment. An ALJ's RFC assessment may be supported by substantial evidence even when the ALJ significantly alters a physician's RFC assessment based on other evidence of record. *See Bentley v. Colvin*, No. 3:13-CV-4238-P, 2015 WL 5836029, at *10 (N.D. Tex. Sept. 30, 2015). In this case, the medical and administrative record provides substantial evidence that Plaintiff cannot perform the full-range of light work. Substantial evidence, furthermore, supports the additional limitations recognized by the ALJ. Based on a review of the administrative record as a whole, the Court should find that substantial evidence supports the ALJ's RFC determination.

## IV. CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court should find that substantial evidence supports the physical and mental RFC determinations of the ALJ. The undersigned thus **RECOMMENDS** that the district court **AFFIRM** the Commissioner's decision to deny benefits.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED** this 22 day of June, 2016.

_____
E. SCOTT FROST
**UNITED STATES MAGISTRATE JUDGE**